IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC BOLDEN, :

    Plaintiff, :

vs. : Case No. 1:09-CV-267

HYDE PARK LANDSCAPE & TREE : JUDGE WEBER
SERVICE, INC., *et al.*, :

    Defendants. :

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONLUSIONS OF LAW ON PLAINTIFF'S CLAIM FOR DISABILITY DISCRIMINATION UNDER OHIO REVISED CODE CHAPTER 4112 (COUNT ONE)**

**I. Proposed Findings of Facts**

1. Hyde Park Landscaping, Inc. ("HPL") is a domestic company with headquarters at 5425 Hetzel Ave., Cincinnati, in the State of Ohio and licensed to do business and in fact does transact business in Hamilton County in the State of Ohio.

2. Hyde Park Landscape & Tree Service, Inc. ("HPL-TS") is a domestic company with headquarters at 5425 Hetzel Ave., Cincinnati, in the State of Ohio and licensed to do business and in fact does transact business in Hamilton County in the State of Ohio.

3. Defendant Michael Shumrick ("Shumrick") is the President and sole owner of both Hyde Park Landscaping, Inc. and Hyde Park Landscape & Tree Service, Inc. (Shumrick Dep. 22).

4. Shumrick purchased HPL-TS in or around 1982. (Shumrick Dep. 18:22–19:5).

5. As the business of HPL-TS grew and evolved, he reorganized the company under a new entity, HPL. (Shumrick Dep. 16–17).

6. After the reorganization, HPL-TS continued to exist as an entity, but eventually conducted little to no day-to-day business operations and by 2007, all HPL-TS business had been moved to HPL. (*Id.*)

7. Bolden began working for HPL in June 2005 as the Turf and Estate Manager. (Bolden Dep. 46–48)

8. As an employee of HPL, Bolden was eligible to participate in HPL's group health insurance plan offered through Humana. (Shumrick Dep. 47:1–2; Shumick Dep. Ex. 3).

9. HPL was the plan administrator of the group health insurance plan. (Shumrick Dep. at 211:20–24; Humana Plan, Bates #HPL-0361 to HPL-0413)

10. When first hired, Bolden was required to fill out a Humana application for insurance, wherein he disclosed that he suffered from hypertension and renal insufficiency. (Shumick Dep. Ex. 3).

11. Bolden's application for insurance was approved and he and his wife were thereafter covered by the plan. Accordingly, HPL deducted approximately $82.00 per week from Bolden's paycheck for premiums for his family medical insurance under the plan. (Bolden Dep. Ex. 10)

12. In November 2006, HPL began looking for a new group health insurance carrier. (Ziegler Dep. 45).

13. HPL eventually chose Community Insurance Company (Anthem Blue Cross & Blue Shield or "Anthem") as their new replacement carrier. (Zeigler Dep. 64:2–4).

14. Ziegler forwarded Anthem insurance applications to HPL's employees with instructions to return the incomplete portions of the applications by the first week of January 2007. (Bolden Dep. 95:23-99:1, Dep. Ex. 5; Ziegler Dep. 73:17-75:4).

2

15. But in December 2006, before he could fill out and submit his form, Bolden was summoned to Ziegler's office. (Bolden Dep. 98:8-18).

16. At that time, Ziegler handed Bolden a near complete Anthem application and instructed him to sign it. (Bolden Dep. 98; Bolden 2nd Dep. 14:23-15:3; Zeigler Dep. 76:22–77:11).

17. Ziegler admits that the handwriting on the application, with the exception of Bolden's signature, is his. (Ziegler Dep. 136-140).

18. Ziegler stated that he used Bolden's personnel file and filled out Bolden's form including the portion he had originally asked Bolden to complete. (Ziegler Dep. 136-140).

19. Additionally, Ziegler told Bolden he used his prior insurance application to make sure the information was accurate and correct. (Bolden Dep. 98-99).

20. As instructed, Bolden merely signed the application form that Ziegler represented to be complete and accurate. (Bolden Dep. 98-99).

21. Although Ziegler filled out the portion of the Anthem application listing certain of Bolden's medical conditions, he failed to list Bolden's renal insufficiency as Bolden had disclosed in his previous Humana application. (Ziegler Dep. 158:14 - 159:12, 161:15 - 161:23; Ziegler Dep. Ex. 5).

22. The Anthem plan went into effect on February 1, 2007, replacing the Humana plan. (2007 Addendum A, Bates #HPL-0075).

23. As with the Humana Plan, HPL was the plan administrator pursuant to the terms of the plan. (Anthem Contract, Bates #HPL-0064; 2007 Addendum A, Bates #HPL-0075).

24. In February 2007, Bolden's kidney conditioned progressed to chronic renal failure, also known as end-stage renal disease. (Medical Records from Dr. Izhar, Bates #HPL-002801 to HPL-002949).

3

25. At that time, he was hospitalized and his medical expenses were largely covered by HPL's group medical insurance. (Bolden Dep. 94:22–95:4).

26. Defendants became aware of Bolden's end-stage renal disease when he was hospitalized or shortly thereafter. (Bolden Dep. 93:7–94:4; Shumrick Dep. 147:6-148:20; Ziegler Dep. 95:16-22).

27. Bolden began receiving kidney dialysis in February 2007 and has received dialysis continually since then. (Bolden Dep. 106:14-19).

28. Bolden receives kidney dialysis three times per week from 4:30 am to 10:00 am to process and eliminate bodily waste because his kidneys are unable to do so on their own. (Bolden Dep. 107:5-8, 130:1-4).

29. Bolden must also adhere to a strictly regimented schedule for taking his medication. (Bolden Dep. 134-137).

30. Further, Bolden suffers from bouts of nausea and from severe fatigue following his dialysis treatment. (Bolden Dep. 105:9-17; 130:9-10).

31. Despite his end-stage renal failure, Bolden coud still perform his job as long as his employer adjusted his schedule to permit him to attend dialysis. (Bolden Dep. 130:11-12).

32. Shumrick permitted Bolden to adjust his work schedule to accommodate his need to receive dialysis treatments. (Shumrick Dep. 149:1-15).

33. In March 2007, Bolden and his physicians began making arrangements for him to receive a kidney transplant. (Bolden Dep. 121:15-21).

34. In July, 2007, after receiving the claims for medical treatment related to Bolden's kidney disease, Anthem increased HPL's premiums from $2,400/month to $6,800/month. (Zeigler Dep. 85:24–86:6)

4

35. Anthem re-priced HPL's monthly premium to account for the increased expense associated with Bolden's condition, as permitted by the insurance contract, but did not threaten to make any other changes to the policy so long as the premiums were paid. (Affidavit of Betsy Worrall ¶7, Bates #P000187 to P000188; June 19, 2007 Anthem Letter, Bates #CIC-00258).

36. Because he paid fifty percent of the cost of his medical insurance, Bolden would have been expected to pay half of the premium increase. (Ziegler Dep. 118:17-119:7)

37. Upon learning of the impending premium increase, Shumrick told Bolden that Anthem had discontinued the policy due to the omission on his insurance application. (Bolden 2nd Dep. 14:3-20).

38. Shumrick terminated Bolden's employment with HPL and immediately re-employed him in the shell entity, HPL-TS, to lower the cost of insurance premiums and cancel Bolden's coverage. (Shumrick Dep. at 152–153, 158:15-159:6).

39. When Defendants cancelled Bolden's health insurance, his wife's health insurance was cancelled as well. (Bolden Dep. 141:13-142-4).

40. Shumrick then cancelled the first group policy with Anthem. (Affidavit of Teresa Frankenhoff, Bates #P000191 to P000192).

41. Shumrick arranged to obtain a new group health insurance policy that only covered HPL, while hiding the existence of HPL-TS (and Bolden). (Affidavit of Richard Denoyer, Bates #P000189 to P000190).

42. Shumrick fired HPL's old insurance broker and hired a new broker to secure a replacement insurance policy. (Ziegler Dep. 98:1-23, 102:8-104:19).

43. The first replacement policy, with Medical Mutual of Ohio, lasted only a few months. (Ziegler Dep. 177:12-21).

44. The Medical Mutual policy was replaced with a second policy from Anthem in March 2008. (Ziegler Dep. 179:15-23; Shumrick Dep. Ex. 10)

45. When HPL entered into its first contract with Anthem in 2007, HPL disclosed the existence of HPL-TS as required in an "Affiliated Companies" form provided by Anthem. (Affiliated Companies Form, Bates #CIC-00134) In that form, HPL certified that HPL and HPL-TS were one employer for purposes of the group health insurance contract. (*Id.*). Additionally, an addendum to the first insurance contract specifically listed HPL-TS as a covered affiliate. (Anthem Contract, 2007 Addendum A, Bates #HPL-0271) And references to both HPL and HPL-TS can be found throughout the first contract documents. (Anthem Plans, Bates #HPL-0059 to HPL-0218).

46. Neither Shumrick nor anyone else acting on behalf of HPL disclosed HPL-TS's existence to Anthem when the second group health insurance contract was formed in April 2007. (Affidavit of Richard Denoyer ¶6, Bates #P000189 to P000190). No "Affiliated Companies" form was filled out. (Affidavit of Richard Denoyer ¶¶7–8, *Id.*). Addendum A did not list HPL-TS as an affiliated company of HPL. (Anthem Contract, 2009 Addendum A, Bates #HPL-0271) No reference to HPL-TS can be found in the second contract documents. (Anthem Plans, Bates #HPL-0059 to HPL-0218) Shumrick specifically indicated on the application for the second Anthem policy that no affiliated companies existed. (Affidavit of Richard Denoyer ¶ 11, Bates #P000189 to P000190; also, Bates No. HPL-0171).

47. When Shumrick re-employed Bolden at HPL-TS after terminating him from HPL, he told Bolden that he would be a "subcontractor" and wouldn't be eligible to participate in HPL's group health insurance plan. (Bolden Dep. at 154).

6

48. From that point on, the company refused to provide Bolden with health care insurance because his disability caused increased premiums. (Shumrick Dep. 153:19-23; Ziegler Dep. 128:18-129:18).

49. Defendants never provided Bolden with a COBRA notice or the right to elect continuation coverage after terminating his coverage even though the contract with Anthem placed that responsibility squarely on Defendants. (Ziegler Dep. 192–194; Anthem Contract, Bates No. HPL-0062; Bolden 2nd Dep. 8:4-8).

50. Because he needed the income, Bolden continued to work for HPL-TS (without insurance coverage) until Shumrick temporarily laid off most of his employees due to a weather-related work slowdown in late 2008/early 2009. (Bolden Dep. 68).

51. In February 2009, Shumrick began recalling his employees. (Shumrick Dep. 194–195).

52. With the exception of Bolden, Shumrick gave his recalled employees specific return to work instructions. (*Id.*).

53. In Bolden's case, however, Shumrick admits that he merely called Bolden to tell him to "come into the office or meet with (him) the following week." (*Id.* at 196:17-23).

54. By this time, Bolden had learned that his co-workers, and even his subordinates, had already been recalled to work. (Bolden Dep. 72:20-73:9).

55. Shumrick never gave Bolden a return to work date, and never explained why he treated Bolden differently than the other employees. (Bolden Dep. 86:4-13).

56. At all relevant times, Bolden desired to return to work as soon as possible. (Bolden Dep. at 86:18-21)

57. Shumrick claims that he called Bolden as late as the second week of March 2009 to discuss his return to work. (Shumrick Dep. 196:24-197:3).

58. Shumrick was served with Bolden's the lawsuit on March 16, 2009. (Hamilton County Docket Id. No. 00032899).

59. Shumrick thereafter ceased all communication with Bolden and neither Shumrick nor anyone else working on behalf of HPL or HPL-TS ever contacted Bolden to discuss his return to work after the filing and service of the lawsuit. (Shumrick Dep. at 197:17–198:3).

60. As of the date of his deposition, Bolden was unable to find replacement employment and his pre-existing kidney condition makes him virtually uninsurable due to his break in coverage. (Bolden Dep. at 172; 139 – 140).

61. As a result, Bolden's plans to have a kidney transplant have been suspended due to a lack of insurance coverage and he has been forced to remain on kidney dialysis. (Bolden Dep. at 124:15–125:7).

## II. Proposed Conclusions of Law

62. R.C. §4112.02 and §4112.99 make it unlawful for an employer to discriminate against a qualified individual in the terms and conditions of employment based on that individual's disability.

63. Ohio courts and federal courts applying Ohio law have consistently held that the case law concerning claims brought under the ADA applies equally to claims brought under Ohio's anti-discrimination statute, R.C. §4112. *Johnson v. MetroHealth Med. Ctr.*, Cuyahoga App. No. 82506, 2004-Ohio-2864, at ¶ 41.

64. R.C. §4112.02 is not preempted by ERISA. *See Id. See also Le v. Applied Biosystems*, 886 F.Supp. 717 (N.D. Cal 1995); *Brand v. Kansas City Gastroenterology & Hepatology*, 547 F. Supp.2d 1001 (W.D. Mo. 2008).

8

65. Disability discrimination can be asserted under a theory of direct evidence of discrimination or a theory of indirect evidence of discrimination. *Monette v. Electronic Data System Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996).

66. Bolden's termination from HPL in 2007 is properly analyzed under a theory of direct evidence because HPL "admits (or the evidence establishes) that its decision was based upon the [Bolden]'s disability...." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1180 (6th Cir. 1996).

67. Bolden has demonstrated that his impairment "substantially limits" one or more of his "major life activities." *Wiegerig v. Timken Co*, 144 Ohio App.3d 664, 671, 761 N.E.2d 118 (2001).

68. Bolden's end-stage renal failure qualifies him as "disabled" under the ADA and R.C. §4112.02 because his body has a substantially limited ability to cleanse internal body fluids. *See Kammueller v. Loomis Fargo*, 383 F.3d 779 (8th Cir. 2004); *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 384-86 (3d Cir. 2004); *See Heiko v. Colombo Savings Bank*, F.S.B., 434 f.3D 249, 255 (4th Cir. 2006).

69. Bolden is an "otherwise qualified individual." It is uncontested that Bolden is capable of performing the essential functions of his job. 42 U.S.C. 12111(8); Def. Ans. Pl. 2nd Amend. Compl. ¶ 19; (Ziegler Dep. 95:11-15; Shumrick Dep. 84:2-4).

70. Defendants violated R.C. §4112 (which tracks the ADA) by terminating Bolden because his disability resulted in higher insurance costs to the employer. 42 U.S.C. §1630.2(m); *Le v. Applied Biosystems*, 886 F. Supp. 717, 720-21 (N.D. Cal. 1995); 29 C.F.R. Pt. 1630, App. (Section 1630.15(a) Disparate treatment Defenses; Section 1630.2(m) Qualified Individual with a Disability).

9

71. Bolden has established discrimination using a direct evidence analysis.

72. Alternatively and/or additionally, Bolden can demonstrate disability discrimination using an indirect evidence analysis (*McDonnell Douglas* burden-shifting framework).

73. Bolden is "disabled." See ¶ 60, above.

74. Bolden is "otherwise qualified" for the position. See ¶ 61, above.

75. Bolden's termination from HPL was an adverse employment decision.

76. Defendants knew Bolden was disabled. (Bolden Dep. at 93:7–94:4; Shumrick Dep. 147:12-18).

77. Defendants treated other similarly-situated employees more favorably than Bolden. No other employee of Defendants was (1) denied employee health benefits for any reason, (2) transferred to a shell entity, and (3) deprived of their employee status and rehired as a "subcontractor." (Shumrick Dep 158:1-22).

78. And, after HPL's January 2009 lay off, all other employees were given return to work instructions and were otherwise hired back between February and April 2009. (Shumrick Dep. 185-197).

79. Defendants have failed to meet their burden of articulating a legitimate non-discriminatory reason for his termination.

80. Accordingly, Bolden has established discrimination using an indirect evidence analysis.

### III. Proposed Conclusion

A reasonable jury could not find a triable issue of fact remaining on whether Defendants discriminated against Bolden because of his disability. Bolden's motion for summary judgment is granted on the issue of liability, with only the issue of damages remaining for trial.

Respectfully submitted,

/s/ Robert J. Beggs

Robert J. Beggs (0002966)
(*John.Beggs@BeggsCaudill.com*)
Trial Counsel for Plaintiff
Danny L. Caudill (0078859)
(*Danny.Caudill@BeggsCaudill.com*)
Co-Counsel for Plaintiff
Gregory R. Mansell (0085197)
(*Greg.Mansell@BeggsCaudill.com*)
Co-Counsel for Plaintiff
Beggs Caudill, LLC
1675 Old Henderson Road
Columbus, Ohio 43220-3644
Telephone: (614) 360-2044
Facsimile: (614) 448-4544

Alvaro G. Velez (0078921)
(*algvelez@aol.com*)
Co-Counsel for Plaintiff
The One Crosswoods Building
100 East Campus View Road, Suite 250
Worthington, Ohio 43235
Telephone: (614) 804-9918
Facsimilie: (614) 343-2222

Michael T. Cox (0080691)
(*mtcox149@yahoo.com*)
Co-Counsel for Plaintiff
4930 Reed Road
Columbus, Ohio 43220
Telephone: (614) 457-7700
Facsimile: (614) 457-7878

11

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on April 15, 2011 by e-mail and regular U.S. Mail upon the following counsel for Defendants:

Alison M. Day (*aday@littler.com*)
Melanie Houghton (*mhoughton@littler.com*)
Littler Mendelson, P.C.
21 East State Street, Suite 1600
Columbus, Ohio 43215

Timothy T. Schenkel (*tschenkel@ffalaw.com*)
Freund, Freeze & Arnold
Fourth & Walnut Centre
105 East Fourth Street, Suite 1400
Cincinnati, Ohio 45402-4035

Danny L. Caudill (0078859)